International Heater Company v. Commissioner.
International Heater Co. v. Commissioner
Docket No. 23589.
United States Tax Court
1951 Tax Ct. Memo LEXIS 174; 10 T.C.M. (CCH) 656; T.C.M. (RIA) 51214; June 29, 1951
*174 Harold R. Medina, Jr., Esq., Albert Rosenblum, Esq., and Leonard W. Burdick, Esq., 313 Mayro Bldg., Utica, N.Y., for the petitioner. Clay C. Holmes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in excess profits tax and declared value excess profits tax for the calendar years 1941 through 1944 as follows: Deficiency
Declared
Excess
Value Excess
Year
Profits Tax
Profits Tax
1941
$ 35,725.94
$ 5.36
1942
28,557.04
1943
68,782.27
86.99
1944
19,925.72
$152,990.97
$92.35
The chief question to be decided is the value of the good will of five predecessor companies which was paid in for $380,000 par value of common stock to the petitioner in 1898, when petitioner was organized in a merger of five established businesses. The question arises under section 718(a)(2) of the Code. A second question relates to an additional amount of $112,000 which was included on the books of petitioner as part of the value of good will. The petitioner now contends that the foregoing amount was erroneously included in the value of good will and represented *175 the value of tangibles. Accordingly, the total amount involved under the issue presented is $492,000. The respondent has recomputed petitioner's excess profits credit for each of the taxable years by eliminating two items from equity invested capital, one of which is good will, $492,000, which the petitioner included in each year. The petitioner concedes that the other item has been eliminated from equity invested capital properly. The petitioner filed its returns with the collector for the twenty-first district of New York in Syracuse. Findings of Fact The stipulated facts are so found. Petitioner, a New York corporation, was organized on June 10, 1898. It is engaged in the manufacture and sale of heating equipment for homes. Its principal place of business is in Utica, New York. In 1898, five companies, located in upstate New York, which were engaged in the manufacture and sale of furnaces, boilers, and other heating equipment for homes, agreed to merge their respective businesses and entered into an agreement to convey their properties to a newly organized corporation, the petitioner, in exchange for its preferred and common stock. Under the merger plan, equal amounts *176 of the preferred and common stock of the petitioner were to be issued to each of the five vendors in exchange for all of their property in proportion to the respective amounts of property paid in by each vendor. The total amount of the stock to be issued was to be determined after an appraisal had been made by two independent appraisers of all of the property, tangible and intangible, of the five vendor companies. After the appraisal was made, it was determined that there would be issued 570,000 shares of petitioner's preferred stock and 570,000 shares of petitioner's common stock, which had a par value of $100 per share; total, $1,140,000 of stock. Upon the organization of the petitioner, each of its seven directors contributed $1,000 each to working capital in exchange for ten shares each of preferred stock. The five companies who paid in all of their assets to the petitioner in exchange for the petitioner's stock were as follows: Russel Wheeler & Son, established in 1842; The Carton Furnace Company, established in 1847; J. F. Pease Furnace Company, established in 1870; Howard Furnace Company, established in 1888; and Kernan Furnace Company, established in 1890. The plants of *177 the foregoing concerns were located in Utica and Syracuse, New York. Officers of the above concerns became the directors of the petitioner. On June 27, 1898, the petitioner entered into separate contracts with each of the foregoing companies for the purchase of all of their assets, subject to their liabilities. The earnings of the five companies for 1892 to 1897, both years inclusive, totaled $317,559.68. Under the contracts of June 27, 1898, provision was made for appraisal of all of the assets of the vendor companies. With respect to the comparative values of good will and other intangibles, the contracts of sale provided that the appraisers' report should show: "The comparative values, in percentages of the goodwill and other intangible assets of each of the vendors, to the aggregate value of the goodwill and other intangible assets of all of them; this valuation shall be based primarily upon the report of earnings to be made to the appraisers by the accountants as provided in subdivision A aforesaid; but also upon due consideration of such other circumstances as in the opinion of the said appraisers shall be material to a proper determination in the premises. It is further *178 agreed, for the purpose of simplifying such appraisal, that the value of the patents and patent rights, trademarks and trademark rights of the several vendors, need not be considered by the appraisers in fixing the comparative values aforesaid; it being assumed for the purpose, that the property of this character belonging to each of the vendors is of equal value. "No money valuation shall be given in this report, but only the comparative valuation in percentages aforesaid." The appraisers made their report on November 12, 1898, in which they reported, inter alia, that: "The comparative values in percentages of the good will and other intangible assets of each of the vendors to the aggregate value of the good will and other intangibles of all of them is as follows: Wheeler
27 17/38 per cent
Howard
15 1/38 per cent
Pease
22 29/38 per cent
Kernan
13 16/38 per cent
Carton
21 13/38 per cent"
No money valuation of good will and other intangibles was made by the appraisers. It was agreed, also, that two-thirds of the petitioner's common stock would be issued for the good will and intangibles of the five vendors, and that $200,000 of preferred stock would *179 be issued for the patterns and molds of all of the vendors. The appraisers determined that the gross value of all of the property of the five concerns was $1,477,734.14; that the assets were subject to $337,734.14, liabilities; and that the net value of all of the property was $1,140,000. Based upon the appraisal, the parties agreed that the properties were to be paid in for petitioner's stock as follows: $200,000 of preferred stock for patterns and molds; $380,000 of common stock for good will and intangibles; and $370,000 of preferred stock and $190,000 of common stock for all of the rest of the tangible assets of the five vendors; total, $570,000 of preferred and $570,000 of common stock. Subsequent to the date of the appraisers' appraisal and report, adjustments were made which decreased the net value of all of the assets of the vendors to $1,095,800, and out of the stock which was issued to the vendors, they retained total preferred and common stock amounting to $551,900 and $543,900, respectively. [1]
*180 The property acquired by the petitioner was carried on its books in June 1898 at the following values: Real Estate
$ 227,180.00
Mortgage
19,500.00
Machinery and Fixtures
47,313.05
Stock
301,408.49
Accounts
190,332.60
Patterns and Flasks
200,000.00
Good Will
492,000.00
$1,477,734.14
The petitioner experienced financial difficulties in 1900, for which one reason was, among others, a lack of working capital. It became apparent that there would have to be either reorganization or liquidation of the petitioner. A plan was worked out on March 15, 1900, whereby the petitioner obtained loans from banks and from a syndicate for notes, and creditors' extension agreements. The banks and a syndicate agreed to loan the petitioner $300,000. All of the stock of the petitioner was transferred to a trustee for the syndicate and other creditors, and the petitioner was controlled by the trustee and its creditors. On March 4, 1902, the petitioner's board of directors adopted a written reorganization plan, under which the authorized capital stock of the petitioner was reduced on March 17, 1903, from $1,800,000 to $551,900, which was the amount of the preferred stock *181 then outstanding. The then outstanding common stock, in the amount of $543,900, was canceled. Pursuant to the reorganization, also, on March 16, 1903, $810,428.14 of the book values of the assets of the petitioner were written off and charged off as of March 1, 1903, as is set forth in the margin. [2] Good will in the amount of $492,000 was entirely eliminated. Previously, on April 2, 1901, organization expense of $13,568.42 had been charged off. Subsequently, on June 17, 1904, and on March 22, 1906, there were additional charge-offs of the values of tangibles in the respective amounts of $13,079.88 and $2,213.86. Pursuant to the plan of reorganization, petitioner's authorized capital stock was increased from $551,900 to $1,008,200 which consisted of $456,300 new cumulative, first preferred, 6 per cent stock, which was issued to the syndicate *182 in exchange for petitioner's notes, and the outstanding, old preferred stock in the amount of $551,900. The good will and intangibles which were paid in for common stock included patents, trade-marks, trade names, customer lists, sales contacts in established sales ares extending through the north central part of the United States, sales organization, and a monopoly over replacement parts for worn-out parts of previously sold heating equipment, which could be made only from the patterns and molds owned by the original concerns. The managers of the five vendors were experienced in the heating equipment business and had good reputations. The products made by the vendor concerns had a good reputation in the heating equipment industry. The trade-marks and trade names of each concern were well known and had been used for many years. Each concern had issued for many years catalogues describing its products. As late as 1910, the petitioner sold five different lines of heating equipment under the trade names it had acquired from the predecessor companies. One of the trade names of the J. F. Pease Furnace Company was "Economy," which the petitioner has used continuously up to the present *183 time and which the petitioner has reregistered in the United States Patent Office. That registration will expire in 1960. The trade name "Carton," previously owned by the Carton Furnace Company, was used by the petitioner until 1940 or 1941. In the heating equipment industry, the trade or brand name is of primary importance. It is customary for a distributor to build up his business around only one line of heating equipment, and to push the trade names of the particular line of heating equipment he is handling. This custom prevailed in 1898 and continued thereafter. The petitioner continued to manufacture and sell five different lines of heating equipment, the lines of its five predecessors, after 1898, because there were well established markets for each line under the trade names. Petitioner, a new corporation, did not have an established trade name. The name "International" was new. Through the established trade names, the petitioner acquired the established markets of its five predecessors. The trade names had substantial value in June 1898. During the period 1898 through 1914, inclusive, the petitioner sold a total of 89,079 furnace units under the trade names which it had acquired *184 from the five predecessor concerns. For the years 1899 to 1914, inclusive, the petitioner's volume of business attributable to the sales of replacement parts and repairs of furnaces previously sold by the five predecessors amounted to $1,208,149. The "repair" business is primarily a business of replacing old parts, and because it is noncompetitive, it is profitable. Petitioner's ratio of profits on sales of repair parts during the years 1899 to 1914, inclusive, ranged from 11 per cent to 40 per cent of such sales. Between May 26, 1944, and August 25, 1949, the petitioner received 37 letters addressed to one or the other of its five predecessors. There was a severe financial panic in the United States in the year 1893. Following the 1893 panic, a financial depression resulted, the effects of which lasted until 1899. The vendor concerns assigned about 45 patents to the petitioner as part of the good will. All of the patents were alive at that time, but the terms of about 14 expired by 1903; about 16 expired by 1910; and 15 expired by 1914. The fair market value of the good will and intangibles of the five predecessor companies which were paid in for 3,800 shares of the petitioner's *185 common stock in about June 1898 was $290,000. There is no evidence which established that some unidentified tangibles which were paid in for petitioner's stock had a fair market value of $112,000 in about June 1898. The petitioner included in the computation of its equity invested capital, for the taxable years 1941 through 1944, $492,000 for intangibles, good will, and undefined tangibles which it alleged were originally paid in for its stock in 1898. The respondent has excluded $492,000 from invested capital in each of the taxable years. Opinion Under section 718(a) of the Code, the definition of equity invested capital includes property paid in for stock, or as paid-in surplus, or as a contribution to capital, and "Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." The pertinent part of the applicable regulation, section 35.718-1 of Regulations 112, is set forth in the margin. [3]
*186 The only question to be decided is whether the good will, the patents, the trade-marks, customer lists, sales areas and sales representatives, the replacement-of-parts business, and other intangibles had a value in 1898 of $380,000 when they were paid in for the stock of the petitioner, as the petitioner contends. The respondent contends that the intangibles had no value at the time they were paid in. A second contention of the petitioner that it is entitled to include in its invested capital an additional amount of $112,000 is denied for failure of proof. The petitioner originally contended in this proceeding that it is entitled to restore to its invested capital the total amount of $810,428.14, the amount which it wrote off in 1903 in its reduction of the book values of tangible and intangible assets. The petition contains an allegation that the respondent erred in not allowing it to restore to equity invested capital $318,428.14, the amount of the write-off of values of tangible assets, as well as $492,000, the amount of good will which was written off. At the trial of this proceeding, the petitioner abandoned its claim to include in invested capital $318,428.14 of tangible *187 assets, for the reason that it could not produce evidence in support of the claim. If the difference between $492,000 and $380,000, namely, $112,000, actually represented on the books of the petitioner in 1898 an erroneous inclusion in the book value of good will of the value of some tangible assets, as the petitioner now contends, but which is open to question, then the petitioner ought to have abandoned, also, its claim to include in invested capital $112,000, because it has not produced one iota of evidence to support the claim. The truth of the matter appears to be that the petitioner is unable now to explain why the value of good will was originally entered in its books, in June of 1898, at $492,000. since other records which were made at about the same time in 1898 show that the good will of the five predecessor companies was paid in for $380,000 of the petitioner's common stock. With respect to the provisions of section 718(a)(2) of the Code, the regulations provide that where the basis to the taxpayer is cost, and stock was issued for the property, the cost of the property is the fair market value of the stock at the date of its issuance. There is no evidence which establishes *188 clearly the fair market value of petitioner's common stock at the date of its issuance. The par value of the stock appears to have been $100 per share. The only evidence relating to the fair market value of the common stock is the stipulation that seven directors of the petitioner made cash contributions to the capital of the petitioner in the amount of $1,000 each, for which each received 10 shares of common stock. There is some vague testimony to the effect that after the petitioner was organized, its stock was "exchanged" frequently at par, but the petitioner did not introduce into evidence the facts relating to any of such "exchanges" of stock, or to the dates thereof, or to any specific transactions. It appears that there was no established market for the petitioner's preferred or common stock at the time of its issuance in 1898. The regulations provide that if stock having no established market value is issued for intangible property, and it is necessary to determine the fair market value of such property, certain factors, "among others," may be taken into consideration in determining such value. See footnote 3. One of the factors is cash offers for the purchase of the business. *189 There is no evidence of any cash offers to purchase any of the businesses of the five predecessors of the petitioner in 1898, or at any other time. We have given consideration to the other factor mentioned in the regulation. "The earnings attributable to such intangible assets while in the hands of the predecessor owner." The respondent has relied strongly upon the formula for determining value of intangibles, such as good will and trademarks, which is set forth in Appeal and Review Memorandum (A.R.M.) 34, 2 C.B. 31 (January-June, 1920). The formula is one of several suggested by the memorandum itself. It predicates the value of intangibles upon average earnings over a period of not less than five years, and a return of 8 to 10 per cent on tangibles, and capitalization of the return on intangibles at from 15 to 20 per cent. The respondent's application of the formula to the formula to the average net earnings of each of the five vendor corporations for the five years immediately preceding 1898 is not in the record, but the respondent contends that its application supports his determination. The memorandum suggests "eliminating any year in which there were extraordinary *190 factors affecting earnings either way." It appears that the respondent has not done so. We observed in Maltine Co., 5 T.C. 1265, 1273, that the memorandum provides within itself that its suggestions are not to be controlling, if better evidence is presented in any specific case. Cf. Clarence Whitman & Sons, Inc., 10 T.C. 264, 271. Although the formula suggested by A.R.M. 34 has received sanction, it has been pointed out that it is not the exclusive way of valuing the good will of a going concern; that if it is to be used, "it should be so applied as to be a fair measure of valuing good will"; that "the past earnings to which the formula is applied should be such as to fairly reflect the probable future earnings"; and that abnormal years, whether above or below average, either should be eliminated, or a longer period of years should be taken to average the bad years against the good ones. White & Wells Co. v. Commissioner, 50 Fed. (2d) 120 (C.A. 2, 1931). Consideration has been given to the application of A.R.M. 34, supra. But, upon consideration of all of the evidence in this proceeding, it has been concluded that it should not be relied *191 upon exclusively, and that other factors, facts, and evidence should be given considerable weight. With respect to the average earnings of each of the five vendors during the five years preceding 1898, it is necessary to recognize that the year 1893 and a few years thereafter were years of business depression, whereas in the year 1892, the earnings of each of the predecessor companies were considerably higher than in 1893. It is fair to include the year 1892, to take the six rather than the five preceeding years' earnings into consideration. We cannot agree that the good will and other intangibles of the five vendor corporations had no value at the time they were paid in for the petitioner's common stock in 1898. To the contrary, the evidence shows that each of the predecessor companies had established valuable good will after many years of business. Their products were distributed widely over the United States to contractors. Their trade names were well established, and even today the petitioner receives correspondence addressed to its predecessors, which reaches it through the direction of the post office where the petitioner's office is located. The petitioner continued to use *192 all of the trade names of its predecessors on the furnaces, boilers, and other heating equipment which it continued to manufacture; it continued the use of the catalogues of its five predecessors, reprinting them to include the name "International." At various times between 1910 and 1930, the petition gave up the use of some of the trade-marks and trade names, but it has at all times up to the present time used the trade name "Economy" which had been used by the J. F. Pease Furnace Company, which was established in 1870, and reregistered the trade-mark in 1935 and 1940, the latest registration running until 1960. It is concluded that the trade names which were acquired were of substantial value. See Rookwood Pottery Co. v. Commissioner, 45 Fed. (2d) 43, 45 (C.A. 6, 1930). The petitioner took over the businesses of the five vendor corporations as going concerns. They had been in business for varying length of time, from 1842, 1847, 1870, 1888, and 1890. In reprinting the catalogues of the predecessor concerns, the petitioner referred to the experience of the business as covering a period of three-quarters of a century, into "the third generation," and stated that it had *193 purchased the "patterns and good will" of its predecessors, seeking to maintain its standards and to make improvements "where possible." The predecessor companies had established high reputations. They had established valuable good will. The fact that all five had been engaged in keen competition does not detract from the values of their respective good will. Rather, it was a matter of business judgment how far the competitive devices and methods should have gone, and the merger of the five competitors was effected as much to preserve the good will which each one had built and established as to terminate harmful competition. It appears to have been true that the earnings of each suffered from the competitive methods used, but the evidence does not show that the good will of each had suffered to any great degree. Price cutting reduces earnings, but price reductions often enhance reputation. See Rookwood Pottery Co., supra. One of the intangibles acquired from each predecessor was the demand for replacements of parts of furnaces and equipment. Each predecessor had a monopoly, so to speak, of its own replacement-of-parts business which could be carried on profitably because *194 of patents, patterns, and molds. The evidence shows the volume of sales of replacements by the petitioner from 1899 to 1915, in comparison with its total sales, and the respective profits, which provide an index to the value of the good will attributable to the established replacement-of-parts part of the business which the petitioner acquired. The annual percentage of replacement or "repair" sales to total sales from 1899 to 1915 ranged from 9 per cent to over 14 per cent, and the profits from such sales amounted to from 11 per cent to 40 per cent. Considerable weight must be given to the value of the good will which the petitioner acquired in receiving continuous and profitable business from repair sales which, over a 15-year period, amounted to over $1,200,000. Negative elements have been scrutinized. For example, many of the 45 patents which the petitioner received expired within 10 years after petitioner acquired them, and only 15 were in existence until 1914, when the last of them ended. Patents are depreciable assets (Regulations 112, section 29.23(1)-6, p. 127). The record does not show what value was placed upon the patents by the predecessor concerns in 1898. If the petitioner *195 had continued to carry a value for the patents on its books, it would have had to take into account the depreciation or obsolescence thereof prior to 1941. Thus restoration of a paid-in amount for the intangible assets represented by patents would have to be offset by the intervening depreciation. See Isbell Porter Co. v. Commissioner, 40 Fed. (2d) 432, 434 (C.A. 2, 1930). The opinion of one of the witnesses of the petitioner on the value of all of the good will and intangibles when paid in for stock is, in our opinion, too high, and his competency to value the intangibles in 1898 is open to question. It has been necessary to give the opinion of the so-called expert witness less weight than the petitioner desires. Although an appraisal was made by two competent and disinterested appraisers prior to the merger in June of 1898, of the total assets of each predecessor corporation, no appraisal of the dollar value of good will and other intangibles was made by the appraisers, because they were instructed not to make such appraisal. All of the parties to the 1898 merger agreement agreed upon a value for good will measured by $380,000, par value of the petitioner's common *196 stock. The petitioner relies strongly upon the agreement of the parties, since it contends here that the good will paid in for stock had a value in 1898 of $380,000. The overall appraisal of the total property paid in for preferred and common stock in the gross amount of $1,477,734.14 is entitled to considerable weight, and the agreement of the parties that all the intangibles would be paid in for $380,000 par value of common stock, while self-serving for purposes of the issue presented here, must be considered in the setting which the appraisal of competent and disinterested appraisers made of the total property which was paid in. The negative factor also to be considered, however, is the average earnings for years preceding the merger. The respondent contends that the write-off of good will to zero in 1903 weighs heavily against the petitioner. The evidence shows that the write-down of book values of assets in 1903 was consistent with a conservative valuation policy as well as expedient during a period of financial difficulty. This factor is not deemed to be detrimental to the petitioner's contention. See Rookwood Pottery Co., supra, and Pioneer Pole & Shaft Co. v. Commissioner, 55 Fed. (2d) 861 *197 (C.A. 6, 1932). Upon consideration of all of the facts and the pertinent criteria of value, it is concluded that the fair market value of the intangible assets acquired by the petitioner in 1898 in exchange for its common stock was $290,000. Decision will be entered under Rule 50. Footnotes
1. The details are not shown by the record in this proceeding. The evidence establishes that there was issued to the vendors $380,000 of common stock for good will.↩
2. Amounts of book values of various assets written off as of March 1, 1903: ↩
Real Estate
$ 50,420.10
Patterns and Flasks
205,289.05
Machinery, etc.
41,182.15
Office Fixtures
9,917.06
Horses and Wagons
$ 675.58
Models and Samples
3,420.24
Electros and Wood Cuts
7,523.96
Good Will
492,000.00
$810,428.14
3. SEC. 35.718-1. DETERMINATION OF DAILY EQUITY INVESTED CAPITAL - MONEY AND PROPERTY PAID IN. - * * * For the purpose of determining equity invested capital, the amount of any property paid in is the unadjusted basis to the taxpayer for determining loss upon a sale or exchange under the law applicable to the taxable year for which the invested capital is being computed. If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance. If the stock had no established market value at the time of the exchange, the fair market value of the assets of the company at that time should be determined and the liabilities deducted. The resulting net worth will be deemed to represent the total value of the outstanding stock. In determining net worth for the purpose of fixing the fair market value of the stock at the time of the exchange, the property paid in for such stock shall be included in the assets at its fair market value at that time. If stock having no established market value is issued for intangible property, and it is necessary to determine the fair market value of such property, the following factors, among others, may be taken into consideration in determining such value: (a) The earnings attributable to such intangible assets while in the hands of the predecessor owner; and (b) any cash offers for the purchase of the business, including the intangible property, at or about the time of its acquisition. A corporation claiming a value for intangible property paid in for stock should file with its return a full statement of the facts relating to such valuation. * * *↩